**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division**

**THROUGHPUTER, INC.,**

    **Plaintiff,**

    **v.**                                  **Civil Action No. 3:21cv216**

**MICROSOFT CORPORATION,**

    **Defendants.**

<u>**MEMORANDUM OPINION**</u>

This matter comes before the Court on Defendant Microsoft Corporation's ("Microsoft") Partial Motion to Dismiss for Failure to State a Claim of Willful Infringement and Indirect Infringement (the "Partial Motion to Dismiss"), (ECF No. 27), and Motion to Transfer Venue Pursuant to 28 U.S.C. § 1404(a) (the "Motion to Transfer"), (ECF No. 38). Plaintiff ThroughPuter, Inc. ("ThroughPuter") responded to both motions, (*see* ECF Nos. 35, 43), and Microsoft replied, (*see* ECF Nos. 37, 49). Accordingly, the matters are ripe for disposition. The Court dispenses with oral argument because the materials before it adequately present the facts and legal contentions, and argument would not aid the decisional process. The Court exercises jurisdiction pursuant to 28 U.S.C. § 1331.[1] For the reasons that follow, the Court will grant the Motion to Transfer. Because the Court will grant the Motion to Transfer, it will not rule on the Partial Motion to Dismiss, and instead defer the Partial Motion to Dismiss to the transferee court.

---

[1] "The district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States." 28 U.S.C. § 1331. ThroughPuter alleges a violation of the Patent Laws of the United States, 35 U.S.C. § 1, *et seq.*, including 35 U.S.C. § 271.

## I.  Procedural and Factual Background

### A.   Procedural Background

On March 31, 2021, ThroughPuter filed a nine-count Complaint in the Eastern District of

Virginia, alleging that Microsoft infringes upon nine of its patents through Microsoft's use of

field programmable gate array ("FPGA") technology in its Azure project.  (Compl. ¶ 1, ECF

No. 1.)  Specifically, ThroughPuter brings the following counts:

    Count 1:  Infringement of U.S. Patent No. 10,963,306 (the "306 patent")
    Count 2:  Infringement of U.S. Patent No. 10,620,998 (the "998 patent")
    Count 3:  Infringement of U.S. Patent No. 10,437,644 (the "644 patent")
    Count 4:  Infringement of U.S. Patent No. 10,430,242 (the "242 patent")
    Count 5:  Infringement of U.S. Patent No. 10,318,353 (the "353 patent")
    Count 6:  Infringement of U.S. Patent No. 10,310,902 (the "902 patent")
    Count 7:  Infringement of U.S. Patent No. 10,133,599 (the "599 patent")
    Count 8:  Infringement of U.S. Patent No. 9,632,833 (the "833 patent")
    Count 9:  Infringement of U.S. Patent No. 9,424,090 (the "090 patent")

(Compl. 45, 60, 70, 82, 92, 100, 109, 117, 123, ECF No. 1.)

On May 27, 2021, Microsoft filed a Partial Motion to Dismiss for Failure to State a Claim

as to ThroughPuter's allegations of willful infringement of seven of its patents, and indirect

infringement of all the patents.  (ECF No. 27.)  On June 10, 2021, Microsoft filed a

Memorandum in Opposition to the Partial Motion to Dismiss, (ECF No. 35), and on July 16,

2021, Microsoft submitted its Reply, (ECF No. 37).

On July 16, 2021 Microsoft filed its Motion to Transfer venue from the Eastern District

of Virginia to the Western District of Washington "in the interests of justice, and for the

convenience of the parties and witnesses."  (Mem. Supp. Mot. Transfer 1, ECF No. 39.)

ThroughPuter responded to the Motion to Transfer, (ECF No. 47), and Microsoft replied, (ECF

No. 49).

2

B.      **Factual Background**[2]

1.      **General Background**

In 2010, ThroughPuter began developing cloud computing and computing acceleration technologies.[3]  (Compl. ¶ 37, ECF No. 1.)  ThroughPuter began patenting its developments in 2011.  (Compl. ¶ 40, ECF No. 1.)  The hardware ThroughPuter developed "implemented dynamic resource management functionality . . . to be deployed on FPGA processors."  (Compl. ¶ 45, ECF No. 1.)  FPGA processors are a type of microprocessor that can be reconfigured based on the tasks to be performed by it.  (Compl. ¶ 1, ECF No. 1.)

In 2013, ThroughPuter principal and founder Mark Sandstrom wrote to Dr. Doug Burger, the Director of Client and Cloud Applications at Microsoft Corporation, disclosing his idea for a parallel execution architecture that ran on FPGA processors.  (Compl. ¶¶ 2, 120, ECF No. 1.)  From 2013 to 2015, Sandstrom "continued to correspond with Microsoft's cloud computing team concerning a potential collaboration between Microsoft and ThroughPuter."  (Compl. ¶ 123, ECF No. 1.)  In 2015, Microsoft started putting FPGA processors in each server for Microsoft Azure, which is a cloud computing platform-as-a-service ("Paas").  (Compl. ¶ 1, ECF No. 1.)  The processors saved Microsoft and Azure users power and increased processing speeds on the cloud computing platform.  (Compl. ¶ 1, ECF No. 1.)

---

[2] Because the Court will grant Microsoft's Motion to Transfer and will not reach the merits of the Partial Motion to Dismiss, the Court will only give a brief overview of the substantive facts prior to discussing the facts relevant to the Motion to Transfer.  However, as the non-moving party, the Court will read all facts in the light most favorable to ThroughPuter.

[3] The Complaint references "ThroughPuter's patented cloud computing, computing acceleration and related technologies, which were developed starting in 2010" and "ThroughPuter's pioneering patent filings starting in 2011."  (Compl. ¶¶ 37, 40.)  However, the Virginia State Corporation Commission Office website lists ThroughPuter's formation date as February 2, 2012.  (Mem. Supp. Mot. Transfer Ex. B 2, ECF No. 39-3.)

In that same year, Microsoft filed, and was ultimately awarded, a patent application on the same hardware-based fabric disclosed to Microsoft by ThroughPuter, without disclosing any information about ThroughPuter's technology to the Patent Office. (Compl. ¶ 2, ECF No. 1.) This, ThroughPuter claims, wrongly suggests that Microsoft invented the architecture underlying Azure, despite ThroughPuter having already patented that architecture that it disclosed to Microsoft. (Compl. ¶ 2, ECF No. 1.) ThroughPuter asserts that Microsoft's conduct was "deliberate and in willful disregard of ThroughPuter's patent rights" because Microsoft had "actual knowledge" of ThroughPuter's patents. (Compl. ¶¶ 153, 201, 244, 289, 326, 356, 393, 427, 454, 482, ECF No. 1.)

According to ThroughPuter, Microsoft's inability to collaborate on this matter has produced serious consequences. (Compl. ¶ 4, ECF No. 1.) While Microsoft has been able to use technology copied from ThroughPuter to "scale up the world's largest and most successful cloud computing platform," thereby generating "billions of dollars in revenue per quarter," ThroughPuter has been incapable of raising sufficient startup capital, gaining collaborators, partners and initial customers, and generally entering the market with a differentiated or more cost-efficient solution. (Compl. ¶ 6, ECF No. 1.)

## 2.   Factual Background Relating to the Motion to Transfer

Plaintiff ThroughPuter is a Delaware corporation with its principal place of business in Virginia. (Compl. ¶¶ 13, 14, ECF No. 1.) ThroughPuter has a license to sell goods and services in the Commonwealth of Virginia under Virginia Entity ID number 11115424. (Compl. ¶ 13, ECF No. 1.) Defendant Microsoft is organized under the laws of Washington state, with its principal place of business in Redmond, Washington. (Mem. Supp. Mot. Transfer 7, ECF No. 39.) Redmond is located within the Western District of Washington. (Mem. Supp. Mot.

Transfer 7, ECF No. 39.)  Microsoft is registered to do business in the Commonwealth of Virginia under Virginia Entity ID number F1157421.  (Compl. ¶ 22, ECF No. 1.)

### a.      ThroughPuter's Operations

ThroughPuter filed the instant suit on March 31, 2021.  (Compl. 131, ECF No. 1.)  The Virginia State Corporation Commission Office website lists ThroughPuter's formation date as February 2, 2012.  (Mem. Supp. Mot. Transfer Ex. B 2, ECF No. 39-3.)  From 2012 to 2020, ThroughPuter's principal place of business was Jersey City, New Jersey.  (Mem. Supp. Mot. Transfer Ex. A 2, ECF No. 39-2.)  ThroughPuter qualified as a Virginia corporation on September 29, 2020, (Mem. Supp. Mot. Transfer Ex. B 2, ECF No. 39-3), although ThroughPuter states that it moved its principal place of business from Jersey City to the Eastern District of Virginia in April or May of 2020.[4]  (Sandstrom Decl. ¶ 4, ECF No. 48; Mem. Opp. Mot. Transfer 2, ECF No. 47.)  ThroughPuter principal and founder Mark Sandstrom moved to Alexandria, Virginia from Jersey City in January 2020.  (Sandstrom Decl. 2, ECF No. 48; Mem. Supp. Mot. Transfer Ex. C 2, ECF No. 39-4.)

In its Complaint, ThroughPuter represents that its principal place of business in Virginia is The College of William & Mary's Launchpad business incubator, also known as the Miller Entrepreneurship Center, located at 249 Richmond Road, Williamsburg, VA 23185.  (Compl ¶¶ 13, 14.)  The incubator is "not a permanent establishment," but a temporary business space that ThroughPuter may use at William & Mary.  (Mem. Opp. Mot. Transfer 7, ECF No. 47.)  Further,

---

[4] Mark Sandstrom's Declaration states that "ThroughPuter's principal place of business has been in this District since April 2020," (Sandstrom Decl. ¶ 4, ECF No. 48), while ThroughPuter's Memorandum in Opposition to the Motion to Transfer states that "ThroughPuter's principal place of business has been in this District since May 2020," (Mem. Opp. Mot. Transfer 2, ECF No. 47).

"physical usage of that space has been limited due to the COVID-19 pandemic." (Compl. ¶ 14, ECF No. 1.)  In its Memorandum in Opposition to the Motion to Transfer, ThroughPuter represents that its "head office" is now in Alexandria, Virginia, and the Williamsburg address is a "research and development location." (Mem. Opp. Mot. Transfer 2, ECF No. 47.)  However, ThroughPuter declines to give an address or description of the Alexandria location. (Mem. Opp. Mot. Transfer 7, ECF No. 47 ("[T]he specific location of the office is not what matters").)[5]

---

[5] Microsoft avers that "ThroughPuter's alleged new headquarters is irrelevant in this choice of forum analysis" in any case because the venue transfer statute "directs the attention of the judge who is considering a transfer to the situation which existed when suit was instituted." (Reply Mot. Transfer 5–6, ECF No. 49 (quoting *Jaffe v. LSI Corp.*, 874 F. Supp. 2d 499, 503 (E.D. Va. 2012) (internal quotation marks omitted)) (citing *Hoffman v. Blaski*, 363 U.S. 335, 343 (1960)).)  Therefore, "ThroughPuter is bound by the conditions that existed when the suit was instituted—249 Richmond Road, Williamsburg, VA 23185 is a temporary principal place of business." (Reply Mot. Transfer 6, ECF No. 49.)

*Blaski*, however, considered a situation where the *defendant* moved its operations after the initiation of the suit and then requested a venue transfer to its new home district. *See Blaski*, 363 U.S. at 343.  The Supreme Court in *Blaski* found that "the conduct of a defendant after suit has been instituted can [not] add to the forums" because the language of 1404(a) allows a court to transfer any civil action to another district *where the case could have been brought* at the initiation of the suit. *Blaski*, 363 U.S. at 343.  Because the defendant did not reside in the requested forum at the initiation of the suit, it could not have been brought there. *Blaski*, 363 U.S. at 343.

The Court is unable to find binding caselaw on a situation where a *plaintiff's* conduct after the suit was initiated either defeated a Motion to Transfer where it would not have otherwise, or where the court refused to consider this conduct in analyzing the plaintiff's home forum for a Motion to Transfer. However, it is clear that a situation where a plaintiff changed its principal place of business after suit was initiated does not implicate the same concern under 1404(a) as a defendant changing its principal place of business because in the former situation— as here—the suit could have been brought in the defendant's requested forum regardless of the plaintiff's old or new "home."

In any event, this case does not turn on whether ThroughPuter's "headquarters" is a temporary, oft unused space at The College of William & Mary, or an undisclosed location in Alexandria, Virginia.  The Court will grant the Motion to Transfer because the convenience of the parties and witnesses, and the interests of justice, strongly outweigh the plaintiff's choice of forum in this case whether ThroughPuter considers its home to be Williamsburg or Alexandria.

The United States Patent and Trademark Office issued the patents in this case between 2016 and 2021.[6] (Compl. ¶¶ 155, 205, 248, 292, 329, 359, 599, 430, 457, ECF No. 1.) ThroughPuter's Complaint alleges acts related to infringement and willful behavior beginning in 2013. (Compl. ¶¶ 2, 120, ECF No. 1.)  Sandstrom communicated or attempted to communicate with Microsoft about ThroughPuter's technology and patents between 2013 and 2018. (Compl. ¶¶ 120–138, ECF No. 1.)  Microsoft ceased responding to Sandstrom in May 2017. (Compl. ¶ 140, ECF No. 1.)

ThroughPuter has developed "various products and services" within the Eastern District of Virginia since 2020. (Compl. ¶¶ 15–16, ECF No. 1.)  ThroughPuter states that it "employs four individuals (including Sandstrom) in order to support its development and commercialization of products in this District that are facilitated by the technology disclosed in patents-in-suit." (Mem. Opp. Mot. Transfer 1, ECF No. 47.)  However, ThroughPuter redacted all employee names from the payroll records submitted to the Court, (Mem. Opp. Mot. Transfer. Exs. A–C, ECF Nos. 48-1, 48-2, 48-2), and stated in its Complaint that its employees have been working remotely to accommodate the pandemic.[7]  (Compl. ¶ 15, ECF No. 1.)

---

[6] Mark Sandstrom is the named "sole and true inventor" on each of the patents and applications in this case. (Compl. ¶ 14, ECF No. 1.)

[7] The Court is unable to find case law that comments on the effect of remote or temporary work environments on a company's "home" location for venue purposes.  The Court will therefore adhere to traditional legal principles that define home location as a company's principal place of business. *See, e.g., Precision Franchising, LLC v. Coombs,* No. 1:06cv1148, 2006 WL 3840334, at *5 (E.D. Va. Dec. 27, 2006).  The Court finds that, as of the filing of this suit and thereafter, ThroughPuter's principal place of business was within the Eastern District of Virginia, whether it was at a temporary workspace, a permanent office space, or at employees' homes.

If anything, the temporary space and flexible nature of a company's work environment speaks more to the convenience of the party in litigating outside its home forum than to where it is legally at home.  That is, in a post-pandemic world of ever-increasing remote work ability, it may be less of a burden for parties to travel to other forums to appear in court and litigate their claims.

ThroughPuter, however, stresses its intention to permanently operate in the Eastern District of Virginia.  It represents that "Mr. Sandstrom established his residence in the desirable Alexandria area [in 2020] based on ThroughPuter's plan to operate and grow its business from its headquarters there."  (Mem. Opp. Mot. Transfer 2, ECF No. 47.)  ThroughPuter also states that it "has plenty of reasons to be located in the technology hub in and around the Northern Virginia area given that Virginia's technology infrastructure, highly-skilled technology workforce, and the wealth of financial resources available to private tech enterprise are a good match for ThroughPuter's development needs and business goals" and that "ThroughPuter was drawn to the Launchpad Business Incubator [at William & Mary] because of its proximity to the Thomas Jefferson National Accelerator Facility (Jefferson Lab) in Newport News, Virginia and the NASA-Langley Research Center in Hampton, Virginia."  (Mem. Opp. Mot. Transfer 4, ECF No. 47.)

ThroughPuter "also selected Virginia as its residence so that it could operate in proximity to Amazon Web Service's (AWS) data centers in Northern Virginia" because it "hosts its Estimator™ and Grafword™ services mainly through the AWS data centers located in this District."  (Mem. Opp. Mot. Transfer 4, ECF No. 47.)  Estimator is "an artificial intelligence applications platform that is facilitated by the patented technology," and Grafword is "a graphical authentication service that is a pilot application of Estimator™."  (Mem. Opp. Mot. Transfer 3, ECF No. 47.)  Neither Estimator nor Grafword are yet commercially available.[8] (Mem. Opp. Mot. Transfer 3, ECF No. 47.)

---

[8] ThroughPuter states that beta versions of its Estimator and Grafword applications are available at estimatorlab.com.  (Compl. ¶¶ 17, 18, ECF No. 1.)  However, that link only appears to offer two free demonstrations and a "free trial" for "create your own Estimator AI powered app."  (*see* estimatorlab.com, last accessed March 13, 2022.)

b.    **Microsoft's Operations**

As stated earlier, Microsoft is organized under the laws of Washington state, with its principal place of business in Redmond, Washington, in the Western District of Washington. (Compl. ¶ 20, ECF No. 1.)  It has had "regular and established" places of business in the Eastern District of Virginia since 1987, including sales offices, retail stores, and data centers.  (Compl. ¶¶ 23–24, ECF No. 1.)  Microsoft has an Azure Data Center in Boydton, Virginia, and "employs at least hundreds of people within this District."  (Compl. ¶¶ 26, 29, ECF No. 1.)  ThroughPuter avers that "Microsoft has a corporate office in Richmond, Virginia with a research and development hub in Reston, Virginia," and "currently has over 100 job postings for engineering positions relating to Azure in its Reston location."  (Mem. Opp. Mot. Transfer 1, ECF No. 47.) ThroughPuter highlights the 2020 announcement of Microsoft's $64 million investment "to establish a new software development and R&D hub in Reston, which will create 1,500 new jobs."  (Alciati Decl. 2, ECF No. 43-2 (citing https://www.fairfaxtimes.com/articles/microsoft-expands-in-reston-1-500-newjobs/article_c8ac9926-a68d-11ea-81c0-ebe17fd1ecc3.html).)

Microsoft states that its work on Azure "has been and continues to be conducted in Redmond, Washington."  (Mem. Supp. Mot. Transfer 1, ECF No. 39.)  Microsoft maintains that the employees who worked on Azure that "have information relevant to this lawsuit" and are named or referenced in the Complaint "work and live in Washington state."  (Mem. Supp. Mot. Transfer 1, ECF No. 39.)  Microsoft points out that the Complaint also references Project Catapult, "which was a Microsoft research initiative that developed the technology used in Azure . . . based in Redmond, Washington."  (Mem. Supp. Mot. Transfer 10, ECF No. 39.)  Microsoft provides Declarations from five Azure team members that assert that those employees live and work in Washington.  (Caulfield Decl., ECF No. 39-10; Putnam Decl., ECF No. 39-11; Burger

9

Decl., ECF No. 39-12; Chung Decl., ECF No. 39-13; Heil Decl., ECF No. 39-14.)  Dr. Burger also states in his declaration that he is "not aware of any Azure engineers who live or work in Virginia."  (Burger Decl. ¶ 7.)

Microsoft also points to Mark Sandstrom's offer to meet with Microsoft employees in Seattle, (Compl. Ex. 19 1, ECF No. 5-6), and states that, if that meeting had taken place, "[o]bviously [it] would have taken place in Washington."  (Mem. Supp. Mot. Transfer 1, ECF No. 39.)  Ultimately, Microsoft emphasizes that its work on Azure and the employees who may be relevant to this lawsuit are located in Washington, (Mem. Supp. Mot. Transfer 1, ECF No. 39), while ThroughPuter emphasizes that the FPGA technology it accuses of infringement is implemented "across a network of data centers throughout the United States, including the hub in Reston Virginia," (Mem. Opp. Mot. Transfer 15, ECF No. 47).

## II.  Legal Standard

"For the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought."  28 U.S.C. § 1404(a).  The decision to transfer a case rests in the district court's sound discretion.  *Koh v. Microtek Intern., Inc.*, 250 F. Supp. 2d 627, 630 (E.D. Va. 2003).  "The movant carries the burden of establishing the propriety of the transfer request."  *Bascom Research, LLC v. Facebook, Inc.*, No. 1:12cv1111, 2012 WL 12918407, at *1 (E.D. Va. Dec. 11, 2012).

A court determining the propriety of a motion to transfer under § 1404(a) follows a two-step inquiry.  *Id.*  First, the court determines whether the claims could have been brought in the transferee forum.  *Id.*  To do so, "a movant must establish that both venue and jurisdiction with

respect to each defendant is proper in the transferee district." *Koh*, 250 F. Supp. 2d at 631 (citations omitted). Second, a court considers the following seven factors:

> (1) ease of access to sources of proof; (2) the convenience of the parties and witnesses; (3) the cost of obtaining the attendance of witnesses; (4) the availability of compulsory process; (5) the interest in having local controversies decided at home; (6) in diversity cases, the court's familiarity with the applicable law; and (7) the interest of justice.

*Samsung Elecs. Co., LTD. v. Rambus, Inc.*, 386 F. Supp. 2d 708, 715 (E.D. Va. 2005). A court's decision to transfer depends on the particular facts of the case because § 1404(a) "provides no guidance as to the weight" that courts should afford each factor. *Id.* at 716 (citing 15 Wright, Miller & Cooper, Federal Practice and Procedure: Jurisdiction 2d § 3847 at 370). However, "[t]he principal factors to consider" are: "(1) plaintiff's choice of forum, (2) convenience of the parties, (3) witness convenience and access, and (4) the interest of justice." *Id.*; *Bascom*, 2012 WL 12918407, at *1.

"Although a plaintiff's choice of forum 'is typically entitled to substantial weight, especially where the chosen forum is the plaintiff's home or bears a substantial relation to the cause of action,' deference to that forum choice 'varies with the significance of the contacts between the venue chosen by plaintiff and the underlying cause of action.'" *Id.* (quoting *Pragmatus AV, LLC v. Facebook, Inc.*, 769 F. Supp. 2d 991, 995 (E.D. Va. 2011)). "[I]f there is little connection between the claims and [the] judicial district, that would militate against a plaintiff's chosen forum and weigh in favor of transfer to a venue with more substantial contacts." *Koh*, 250 F. Supp. 2d at 635.

In a patent case, "as a general rule, the preferred forum is that which is the center of the accused activity." *Acterna, L.L.C. v. Adtech, Inc.,* 129 F. Supp. 2d 936, 939 (E.D. Va. 2001) (citation and internal quotation marks omitted). "The center of accused activity will most often

be where the offending device is produced." *Id.* "The trier of fact ought to be as close as possible to the milieu of the infringing device and the hub of activity centered around its production." *Id.* (citing *GTE Wireless, Inc. v. Qualcomm, Inc.*, 71 F. Supp. 2d 517, 519 (E.D. Va. 1999)). "[T]he nucleus of operative facts [in a patent case] forms at or near the 'center of the allegedly infringing activities,' primarily where the accused products were designed, developed, and manufactured." *Macronix Int'l Co. v. Spansion Inc.*, No. 3:13cv679, 2014 WL 934521, at *2 (E.D. Va. March 10, 2014) (citing *Koh,* 250 F. Supp. 2d at 636).

### III.  Analysis

For the following reasons, the Court will grant Microsoft's Motion to Transfer and transfer this case to the Western District of Washington.  First, the Court finds that this case could have originally been brought in the Western District of Washington.  Next, the Court finds that, while the Eastern District of Virginia is ThroughPuter's home forum, the balance of relevant factors and the patent infringement allegations involved strongly weigh in favor of transfer.

### A.    ThroughPuter Could Have Brought Its Claims Against Microsoft in the Western District of Washington

This case could have originally been brought in the Western District of Washington. Under the change of venue statute, "a district court may transfer any civil action to any other district or division where it might have been brought." 28 U.S.C. § 1404(a).  To demonstrate that an action could have been brought in the proposed transferee forum, the movant must establish that both venue and jurisdiction are proper for each defendant. *Koh v. Microtek Intern., Inc.*, 250 F. Supp. 2d 627, 630 (E.D. Va. 2003).  Pursuant to 28 U.S.C. § 1400(b), a civil action for patent infringement may be brought in any district where the defendant resides or where the defendant has committed acts of infringement and has a regular and established

place of business. *TC Heartland LLC v. Kraft Foods Grp. Brands LLC*, 137 S. Ct. 1514, 1516 (2017). There is no question here that venue and jurisdiction are proper for Microsoft in the Western District of Washington because Microsoft is incorporated in Washington with its principal place of business in Redmond, Washington (located within the Western District of Washington).[9] (Compl. ¶ 20, ECF No. 1.) Therefore, ThroughPuter's claims against Microsoft might have been brought in the transferee forum. *Bascom Research, LLC v. Facebook, Inc.*, No. 1:12cv1111, 2012 WL 12918407, at *1 (E.D. Va. Dec. 11, 2012).

### B.    The Facts in This Case Strongly Weigh in Favor of Transfer

The facts of this case strongly weigh in favor of transfer to the Western District of Washington. Although the Court finds that the Eastern District of Virginia is ThroughPuter's home forum at this time, the patent infringement allegations involved in this case, as well as the ease of access to sources of proof; the convenience of the parties and witnesses; the cost of obtaining the attendance of witnesses; the availability of compulsory process; the interest in having local controversies decided at home; the court's familiarity with the applicable law; and the interest of justice strongly weigh in favor of transferring this matter to the Western District of Washington.

### 1.    ThroughPuter's Choice of Forum is Not Entitled to Substantial Weight in this Case

---

[9] In its Memorandum in Opposition to Microsoft's Motion to Transfer Venue, ThroughPuter argues that because Microsoft used the wrong legal standard in demonstrating that this suit could be brought in the Western District of Washington, it has not met its threshold burden. (Mem. Opp. Mot. Transfer 10 n.2, ECF No. 47.) However, this argument fails because the decision to transfer a case rests in the district court's sound discretion, *Koh*, 250 F. Supp. 2d at 630, and under the correct legal standard, venue and jurisdiction are proper for Microsoft in the Western District of Washington.

The first "principal factor" to consider is ThroughPuter's choice of forum. *Samsung Elecs. Co., LTD. v. Rambus, Inc.*, 386 F. Supp. 2d 708, 716 (E.D. Va. 2005). Although the Eastern District of Virginia is now ThroughPuter's home district,[10] its choice of forum is not entitled to substantial weight because of the nature of the patent allegations and the limited connection between ThroughPuter's claims and this District.

Under most circumstances, "[t]he plaintiff's choice of forum is . . . entitled to substantial weight." *Pragmatus AV, LLC v. Facebook, Inc.*, 769 F. Supp. 2d 991, 995 (E.D. Va. 2011). But, "the level of deference of such choice varies with the significance of the contacts between the venue chosen by the plaintiff and the underlying cause of action." *Id.* "Even when the plaintiff sues in its home forum, that fact is not by itself controlling and the weight of that factor depends on the nexus tying the case to the forum." *Gebr. Brasseler GmbH & Co. KG v. Abrasive Tech., Inc.*, No. 1:08cv1246, 2009 WL 874513, at *2 (E.D. Va. March 27, 2009). ThroughPuter's choice of forum is entitled to less deference because of the underlying patent allegations and limited nexus tying the case to the Eastern District of Virginia.

      a.      **The Patent Allegations in This Case With the Center of Accused Activity in Washington Cuts Against ThroughPuter's Choice of Forum**

---

[10] The Court finds that the Eastern District of Virginia is ThroughPuter's home district because its principal place of business has been in Virginia since 2020. As discussed *supra*, the Court finds that the parties' disagreements about (1) when precisely in 2020 ThroughPuter changed its principal place of business from New Jersey to the Eastern District of Virginia; (2) whether ThroughPuter's headquarters are located in Williamsburg, Virginia, or Alexandria, Virginia (both are located within the Eastern District of Virginia); and, (3) what effect the fact that ThroughPuter's office space is a temporary workspace has on this case, are of no moment. While these factors influence the nexus of the underlying cause of action to the current forum and the convenience of ThroughPuter in litigating this matter outside its home forum, they do not negate the fact that ThroughPuter was legally at home in this District as of the filing of this suit and has remained here thereafter.

14

Because, in a patent case, "the preferred forum is that which is the center of the accused activity," and the center of the accused activity here is in the Western District of Washington, ThroughPuter's choice of forum is entitled to less weight. *Acterna, L.L.C. v. Adtech, Inc.,* 129 F. Supp. 2d 936, 939 (E.D. Va. 2001). "The trier of fact ought to be as close as possible to the milieu of the infringing device and the hub of activity centered around its production." *Id.*

The "hub of activity centered around [the] production" of Microsoft's Azure servers is the Western District of Washington. *Id.* Microsoft's design, development, and testing activities in the United States relating to Azure take place in Redmond, Washington. (Burger Decl. ¶ 7, ECF No. 39-12.) The vast majority of engineers working on Azure in the United States live and work in the greater Seattle area, (Burger Decl. ¶ 7, ECF No. 39-12), even if Microsoft is currently hiring additional engineers to work on Azure in Reston, Virginia, (Alciati Decl. ¶¶ 7-8, ECF No. 43–2). All Microsoft employees that ThroughPuter identified in its Complaint or Microsoft identified as having information that could assist in this suit live and work in Washington state. (Caulfield Decl. ¶¶ 2, 4–5, ECF No. 39-10; Putnam Decl. ¶¶ 2, 4–5, ECF No. 39-11; Burger Decl. ¶¶ 3, 5–6, ECF No. 39-12; Chung Decl. ¶¶ 2, 4–5, ECF No. 39-13; Heil Decl. ¶¶ 2, 4–5, ECF No. 39-14.) While there is one of many domestic Azure servers located within the Eastern District of Virginia, (Compl. ¶ 26, ECF No. 1), neither party mentions where the allegedly infringing component parts are manufactured. Therefore, the "nucleus of operative facts" in this case—where the "accused products were designed [and] developed"—is in Redmond, Washington. *Macronix Int'l Co. v. Spansion Inc.*, No. 3:13cv679, 2014 WL 934521, at *2 (E.D. Va. March 10, 2014). In the interest of placing "[t]he trier of fact . . . as close as

possible to the milieu of the infringing device," the patent claims in this case are best adjudicated in the Western District of Washington.[11] *Acterna,* 129 F. Supp. 2d at 939.

> **b.** **There is a Limited Nexus Between ThroughPuter's Claims and This District**

In addition to the center of the accused infringing activity taking place outside the Eastern District of Virginia, ThroughPuter's claims lack any additional substantial nexus to this District. "Even when the plaintiff sues in its home forum, that fact is not by itself controlling and the weight of that factor depends on the nexus tying the case to the forum." *Gebr,* 2009 WL 874513, at *2.

ThroughPuter points to *comScore, Inc. v. Integral Ad. Sci., Inc.*, 924 F. Supp. 2d 677, 682 (E.D. Va. 2013) for the proposition that its choice of forum is entitled to substantial weight because "ThroughPuter is developing and commercializing products that utilize the patented technology developed by its founder" in this District. (Mem. Opp. Mot. Transfer 9, ECF No. 47.) However, the facts in *comScore* show that the plaintiff's underlying claims in that case had a much more significant nexus to this District than the claims here.

The court in *comScore* found that "not only is the Eastern District of Virginia Plaintiff's home forum, but also Plaintiff's 'strong presence' and active development of products subject to the patents-in-suit in this District provide Plaintiff with 'legitimate and significant connections' to this District sufficient to weigh strongly against transfer." *comScore,* 924 F. Supp at 682. First, the plaintiff "ha[d] maintained its principal place of business and global headquarters in

---

[11] Further, ThroughPuter alleges "willful" infringement of each asserted patent, seeking enhanced damages under 35 U.S.C. § 284. (Compl. ¶¶ 202, 245, 289, 326, 356, 393, 427, 454, 482, ECF No. 1.)  The "nucleus of operative facts" for willful infringement—whether Microsoft's infringement was "knowing, intentional, and willful," (Compl. ¶¶ 202, 245, 289, 326, 356, 393, 427, 454, 482, ECF No. 1.)—is undoubtedly the Western District of Washington, where Microsoft's employees who would have engaged in the willful activity are located.

Reston, Virginia, where Plaintiff currently retains over 400 full-time employees and most of its officers" for 14 years. *Id.* Second, "Plaintiff produce[d] three products in Virginia which utilize the ad verification technology that is the subject of the patents-in-suit and which compete against Defendants' allegedly infringing products." *Id.* Lastly, "those of Plaintiff's employees who have knowledge about the technical operation and function of these products, as well as their sales and marketing, all work in Virginia, and all evidence or documents related to these products can be found here." *Id.* The court concluded that "Plaintiff is not simply a holder of the patents in question, located in Virginia, but instead is an active developer of the technology protected by those patents. And this active utilization of that technology, along with the production and sale of products based on it, all in this District, furnishes Plaintiff with a significant, legitimate connection to the Eastern District of Virginia, sufficient to justify affording Plaintiff's choice of forum substantial weight." *Id.* at 683.

However, unlike these facts in *comScore*, ThroughPuter *does not* hold a "'strong presence' and active development of products subject to the patents-in-suit in this District [to] provide Plaintiff with 'legitimate and significant connections' to this District sufficient to weigh strongly against transfer." *Id.* at 682. First, ThroughPuter has only been located in the Eastern District of Virginia for two years. During most of the relevant infringement timeframe, 2013 to 2020, ThroughPuter and its founder, Mark Sandstrom, were located in New Jersey.[12] It is also unclear where ThroughPuter's employees live and work, as ThroughPuter redacted the names of its employees from its payroll exhibits and withheld any more specific information. Second, neither of ThroughPuter's products that supposedly utilize the patented technology are produced

---

[12] All of the alleged communications between Mark Sandstrom and Microsoft took place between 2013 and 2018, with Microsoft ceasing responding to Sandstrom in 2017.

or sold in this District because neither are yet commercially available.  They therefore do not compete against Microsoft Azure.  Because ThroughPuter's Estimator and Grafword projects do not compete against the accused products, where "Plaintiff's employees who have knowledge about the technical operation and function of [Plaintiff's] products" are located is not relevant to "damages, the validity of the patents-in-suit, and related lawsuits," as it was in *comScore*. *Id.* at 687.

Microsoft avers this case is more akin to *Pragmatus*. *Pragmatus*, 769 F. Supp. 2d at 995. In *Pragmatus*, the court found that the plaintiff's choice of forum was entitled to "minimal weight in light of the weak connection between the plaintiff and the Eastern District of Virginia" because:  (1) Pragmatus was a "'non-practicing entity,' meaning that it does not research and develop new technology but rather acquires patents, licenses the technology, and sues alleged infringers," (2) Pragmatus's "only employee in this district [wa]s a co-owner who has owned a home in Alexandria since 2007 and works here part-time," and (3) "Pragmatus was formed in Alexandria a week before it acquired the patent portfolio and five months before it filed this lawsuit." *Id.*

Unlike *Pragmatus*, ThroughPuter is not a non-practicing entity, as it points out.  (Mem. Opp. Mot. Transfer 7, ECF No. 47.)  ThroughPuter "is a legitimate business based in Virginia that is developing and launching commercial service offerings in this District."  (Mem. Opp. Mot. Transfer 8, ECF No. 47.)  However, like *Pragmatus*, its employees' connections to this District appear tenuous on the available record.  Mark Sandstrom is the only employee with information regarding this lawsuit, and he has only been located in Virginia since 2020, working an unknown amount at an undisclosed location in Alexandria, Virginia.  And, only one or two of

the nine patents asserted in this case were issued after ThroughPuter relocated to this District, less than a year before it filed the present suit.[13]

There are also no key non-party witnesses located in this District.  Where "the Plaintiffs' choice of forum is amenable to inexpensive discovery and trial because the forum is home both to the Plaintiffs and to key non-party witnesses, . . . a plaintiff's choice of forum is entitled to significant weight."  *Byerson v. Equifax Info. Servs., LLC*, 467 F. Supp. 2d 626, 633 (E.D. Va. 2006).  Here, although the Eastern District of Virginia is ThroughPuter's home forum, it does not house "key non-party witnesses."  The only potential witness *at all* located in this District is Mark Sandstrom, a party witness.

Therefore, because:  (1) ThroughPuter had only been located in this District for less than a year preceding the instant suit; (2) ThroughPuter does not produce for sale in this District products that compete with the allegedly infringing technology; (3) the majority of the infringing events took place outside this District between the years 2013 to 2020 when ThroughPuter was located in New Jersey; and (4) there are no key non-party witnesses in this District, ThroughPuter's choice of forum—even as its home forum—is entitled to less weight.

## 2.    The Convenience of the Parties Weighs in Favor of Transfer

The second "principal factor" to consider is the convenience of the parties.  *Samsung*, 386 F. Supp. 2d at 715.  The convenience to ThroughPuter and to Microsoft weighs in favor of

---

[13] Again, it is unclear when ThroughPuter actually relocated to the Eastern District of Virginia.  ThroughPuter qualified as a Virginia corporation on September 29, 2020, but Mark Sandstrom stated that ThroughPuter's principal place of business has been in this District since April 2020, while ThroughPuter's Memorandum in Opposition to the Motion to Transfer states that ThroughPuter's principal place of business has been in this District since May 2020.  The 998 Patent (Count II) was issued on April 14, 2020, either right before or right after ThroughPuter relocated to Virginia.  This case was filed on March 31, 2021, less than a year after ThroughPuter relocated to Virginia by any measure.

transfer.  The convenience to the parties "includes assessment of the ease of access to sources of

proof, the cost of obtaining attendance of witnesses, and the availability of compulsory process."

*Byerson*, 467 F. Supp. 2d at 633.  When weighing this factor, "the logical starting point is a

consideration of the residence of the parties."  *Mullins v. Equifax Info. Servs., LLC*, No.

3:05cv888, 2006 WL 1214024, at *6 (E.D. Va. April 28, 2006).  However, "residence is not a

controlling factor if the convenience of witnesses and the interest of justice point strongly in a

contrary direction."  *Id.*  Transfer is not appropriate when "the result of transfer would serve only

to 'shift the balance of inconvenience'" from one party to another.  *Board of Trustees v. Baylor

Heating & Air Conditioning, Inc.*, 702 F. Supp. 1253, 1258 (E.D. Va. 1988) (quoting *Eastern

Scientific Marketing v. Tekna-Seal Corp.*, 696 F. Supp. 173, 180 (E.D. Va. 1988)).  The

convenience of the parties weighs in favor of transfer to the Western District of Washington

because there is easier access to sources of proof in Washington, the cost of obtaining the

attendance of witnesses in lower in Washington, and there is greater availability of compulsory

process in Washington where the allegedly infringing activities took place.

     a.     **There is Easier Access to Sources of Proof in the Western
District of Washington**

There is easier access to sources of proof in the Western District of Washington.  This

Court has held that "[i]n actions alleging patent infringement, because the bulk of relevant

evidence comes from the accused infringer, [] the place where defendant's documents are kept

weighs in favor of transfer to that location."  *Sunstone Info. Def., Inc. v. F5 Networks, Inc.*, 2021

WL 5804571 (E.D. Va. 2021).

Microsoft's headquarters is located in Redmond, Washington.  (Mem. Supp. Mot.

Transfer 9, ECF No. 39.)  The design and development of Azure and Project Catapult took place

in Redmond, Washington.  (*See* Burger Decl. ¶¶ 4–7.)  All five Microsoft employees with

relevant information to this case live and work in Redmond, Washington, while Mark Sandstrom is the only witness outside of Washington. (*See* Burger Decl. ¶¶ 1–7, ECF. No 39–12; Heil Decl. ¶¶ 1–5, ECF No. 39-15; Caulfield Decl. ¶¶ 1–5, ECF No. 39-11; Putnam Decl. ¶¶ 1–5, ECF No. 39-12; Chung Decl. ¶¶ 1–5, ECF No. 39-14.)  Microsoft asserts that "most, if not all, materials relevant to Microsoft's accused products and services are located in the Western District of Washington." (Mem. Supp. Mot. Transfer 9, ECF No. 39.)

ThroughPuter, however, argues that this factor is weaker because "it is entirely likely—if not certain—that the 'Azure documents' are stored electronically, likely on the Azure storage cloud." (Mem. Opp. Mot. Transfer 14, ECF No. 47.)  It is correct that, given advances in technology, the comparatively low cost of transporting documents "can make their location a less pressing consideration when deciding a motion to transfer venue." *Finkel v. Subaru of America, Inc.*, No. 3:06cv292, 2006 WL 2786811, at *4 (E.D. Va. Sept. 26, 2006); *see also NanoEntek, Inc. v. Bio-Rad Laboratories, Inc.*, No. 2:11cv427, 2011 WL 6023189, at *4 (E.D. Va. Dec. 2, 2011) (agreeing that "changes in technology have lessened the importance of the court's proximity to physical documentation.").  Although this factor may not weigh *as heavily* given the ease with which information can be transmitted, it still weighs in Microsoft's favor because, to the extent Microsoft "has a physical repository of 'Azure documents,'" those documents would be located and easier to access from the Western District of Washington. (Mem. Opp. Mot. Transfer 14, ECF No. 47.)

    **b.**  **The Cost of Obtaining Witnesses Would be Lower in the Western District of Washington**

Microsoft has specifically identified five potential key witnesses in this case, all of whom work and reside in Washington state. (Reply Mot. Transfer 8, ECF No. 49.)  Conversely, ThroughPuter has only identified Mark Sandstrom as a potential key witness for its case that

21

works and resides in Virginia. (Reply Mot. Transfer 8, ECF No. 49.) If there are additional witnesses for Microsoft, they will likely be located in Washington because the vast majority of engineers working on Azure in the United States live and work in the greater Seattle area. (Mem. Supp. Mot. Transfer 10, ECF No. 39.) However, Mark Sandstrom is likely the only witness for ThruPuter because he is the sole named inventor of all the patents in this case. (*See* Compl. ¶¶ 156, 206, 249, 293, 330, 360, 397, 431, 458, ECF No. 1.) The only other individual ThroughPuter disclosed in Initial Disclosures was Daniel van de Wiede, a professor at the University of Wisconsin-Madison who lives in Madison, Wisconsin. (Reply Mot. Transfer 4, ECF No. 49.) While ThroughPuter states that it currently employs three individuals in addition to Mark Sandstrom, (Mem. Opp. Mot. Transfer 1, ECF No. 47), it does not indicate that any of those individuals have knowledge of the present suit or were even employed during the relevant timeframe, and—again—conceals the identity of those individuals in its exhibits.

Microsoft highlights the significant cost of obtaining witness attendance in the Eastern District of Virginia. For witnesses in the Western District of Washington, travel to the Eastern District of Virginia involves a five to six-hour flight and likely at least one overnight stay. (Mem. Supp. Mot. Transfer 10, ECF No. 39.) That "Microsoft has a corporate office" in Virginia or has sufficient resources to afford this costly travel, as ThroughPuter argues, does not negate the cost itself or travel time involved for these witnesses.[14] (Mem. Opp. Mot. Transfer 14, ECF No. 47.)

---

[14] ThroughPuter also argues that "Microsoft cannot legitimately claim to be burdened by litigation in this District" when it "had been awarded an exclusive ten billion dollar JEDI Cloud contract with the Department of Defense." (Mem. Opp. Mot. Transfer 12, ECF No. 47.) This argument fails because (1) the Department of Defense cancelled the JEDI contract, (*see* Reply Mot. Transfer 7, ECF No. 49), and (2) the JEDI contract and Microsoft's intentions to increase presence in the Eastern District of Virginia in the future have no bearing on the convenience to the specific witnesses in this dispute who are located exclusively in Washington state.

ThroughPuter additionally argues that the convenience of party witnesses should be given little weight because compulsory process is not needed to obtain their testimony.  (Mem. Opp. Mot. Transfer 11, ECF No. 47.)  That is, (1) "should these five witnesses be noticed for deposition, ThroughPuter's counsel will travel to the Redmond, Washington area" and (2) it is not certain that each witness's testimony will be material and non-cumulative, and therefore necessary that they appear for trial.  (Mem. Opp. Mot. Transfer 11, ECF No. 47.)  Even so, the cost to notice these depositions—even as cost to ThroughPuter that it is willing to incur—contributes to the cost of obtaining witnesses in the Western District of Washington were the case to be litigated in the Eastern District of Virginia.

Therefore, the cost of obtaining witnesses in this case would be lower in the Western District of Washington because significantly more potential witnesses are located in that district and the cost of obtaining each of those witnesses is exacerbated by the significant distance between Richmond, Virginia and Washington state.

### c.  The Availability of Compulsory Process Weighs Slightly in Favor of the Western District of Washington

The last convenience factor, the "availability of compulsory process," targets the availability of compulsory process for the attendance of unwilling witnesses.  *Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 508 (1947).  This factor encompasses the need to subpoena witnesses to appear at trial and requires a showing that "witnesses who are beyond compulsion will not appear . . . voluntarily."  *Samsung*, 386 F. Supp. 2d at 719.  Neither Microsoft nor ThroughPuter has indicated that its witnesses would not appear voluntarily; however, the restrictions of Federal Rule of Civil Procedure 45(c)(1)[15] place more potential witnesses outside the subpoena power of

---

[15] Federal Rule of Civil Procedure 45(c)(1) allows a subpoena to "command a person to attend a trial, hearing, or deposition only . . . (A) within 100 miles of where the person resides, is

the Eastern District of Virginia than the Western District of Washington.  Therefore, this element

slightly favors transfer.  *See NanoEntek*, 2011 WL 6023189, at *6 ("Although [Defendant]'s

potential employee and third party witnesses reside in the [transferee forum], [Defendant] does

not assert that compulsory process will be needed to secure their testimony; therefore, this

element, at most, can only slightly favor transfer.")

Because sources of proof would be easier to access in the Western District of

Washington, the cost of obtaining attendance of witnesses would be lower in the Western

District of Washington, and there is greater availability of compulsory process for potential

unwilling witnesses in the Western District of Washington, the convenience to the parties in this

case does not just shift the burden of inconvenience from Microsoft to ThroughPuter, but

significantly favors transfer to the Western District of Washington.

### 3.    The Convenience of the Witnesses Weighs in Favor of Transfer

The third "principal factor," the convenience to the witnesses, strongly favors transfer to

the Western District of Washington.  *Samsung*, 386 F. Supp. 2d at 716.  The "vast majority of

engineers working on Azure in the United States live and work in the greater Seattle area."

(Burger Decl ¶ 7.)  All Azure employees that ThroughPuter names in its Complaint and

Microsoft identifies as having knowledge of the accused product and its development live and

work in Washington state.  (Compl. ¶¶ 53, 87, ECF No. 1; Mem. Supp. Mot. Transfer 5, ECF

No. 39.)  "[T]hese witnesses would need to travel a substantial distance to Virginia, away from

---

employed, or regularly transacts business in person; or (B) within the state where the person
resides, is employed, or regularly transacts business in person, if the person (i) is a party or a
party's officer; or (ii) is commanded to attend a trial and would not incur substantial expense."
Fed. R. Civ. P. 45(c)(1).  Washington and Virginia are more than 100 miles apart.  (Mem. Supp.
Mot. Transfer Ex. F 2, ECF No. 39-7.)

their regular employment and for overnight stays" to appear in the Eastern District of Virginia. (Mem. Supp. Mot. Transfer 10, ECF No. 39.)

Further, Microsoft's witnesses are highly material to this case. A court can infer "that witnesses involved in the design and manufacture of the accused product are material." *NanoEntek*, 2011 WL 6023189, at *5. It follows that the aforementioned Azure employees that have relevant knowledge about the accused product constitute material witnesses to this action. Because ThroughPuter's Complaint alleges patent infringement by Microsoft's development of the Azure project, Microsoft's employees working on Azure will provide the central testimony in this case.

Additionally, given ThroughPuter's allegations of willful infringement for each count, the credibility of Microsoft's employees responsible for developing the Azure product will be paramount. "When the key factual issues at trial turn on the credibility and demeanor of the witness, [it is] prefer[red for] the finder of fact to observe live testimony of the witness." *Anderson v. Warren*, No. 4:14cv28, 2016 U.S. Dist. LEXIS 201964, at *2 (E.D. Va. May 4, 2016) (internal quotation marks and citation omitted). "[G]reater weight should be accorded inconvenience to witnesses whose testimony is central to a claim and whose credibility is also likely to be an important issue." *Samsung*, 386 F. Supp. 2d at 718. Therefore, the convenience to the Microsoft employees whose credibility will be critical in this matter weights most heavily and those employees would be far less inconvenienced in the Western District of Washington.

ThroughPuter, on the other hand, identifies only Mark Sandstrom as a potential witness. The record shows that Sandstrom has been willing to travel to Washington in the past. (*See* ECF Nos. 5-6, 7-5.) Similarly, ThroughPuter has indicated that its employees often work remotely, and it has not identified any permanent workspace that Sandstrom must attend on a daily basis.

(Compl. ¶ 15, ECF No. 1.)  Further, ThroughPuter provides a robust record of documentary

evidence detailing the communications between Sandstrom and Microsoft, (*see* Compl. Exs. 19,

32, ECF Nos. 5-6, 7-5), making his credibility less important than the credibility of Microsoft

employees, who may be more important for Microsoft to present its case.

Therefore, given the significantly higher number of potential witnesses located in

Washington and the importance of their testimony in relation to the record ThroughPuter has

already established, the convenience of the witnesses weighs strongly in favor of transfer to the

Western District of Washington.

### 4. The Interest of Justice Weighs in Favor of Transfer

The final "principal factor," the interest of justice, strongly favors transfer to the Western

District of Washington. *Samsung*, 386 F. Supp. 2d at 716.  The interest of justice "encompasses

public interest factors aimed at 'systemic integrity and fairness.'" *Id.* at 721 (citation omitted).

"In some cases, 'the interest of justice may be decisive in ruling on a transfer motion, even

though the convenience of the parties and witnesses point in a different direction.'" *Byerson*,

467 F. Supp. 2d at 635 (quoting *Samsung*, 386 F. Supp. 2d at 716).

### a. Systemic Integrity Weighs in Favor of Transfer

"Most prominent among the elements of systemic integrity are judicial economy and the

avoidance of inconsistent judgments." *Byerson*, 467 F. Supp. 2d at 635.  "When related actions

are pending in the transferee forum, the interest of justice is generally thought to 'weigh heavily'

in favor of transfer." *Samsung*, 386 F. Supp. 2d at 721.  "Judicial economy and the interest of

justice favor a venue which has already committed judicial resources to the contested issues and

is familiar with the facts of the case." *Id.* at 722.  For example, "[w]here a party has previously

litigated a case involving similar issues and facts, a court in that district will likely be familiar

26

with the facts of the case.  As a matter of judicial economy, such familiarity is highly desirable."
*Id.* at 722. (internal quotation marks and citation omitted).

Microsoft points to *SRC Labs, LLC v. Microsoft Corp.*, No 1:17cv1172, 2018 WL
10425506 (E.D. Va. Feb. 26, 2018), a case involving allegations of patent infringement by
Microsoft's Azure products currently pending in the Western District of Washington.[16]  *Id.*
Microsoft avers that SRC Labs, LLC's Complaint alleges that Microsoft's infringement is
connected to FPGAs.  (Mem. Supp. Mot. Transfer 12, ECF No. 39.)  ThroughPuter counters that
"[t]he notion that [*SRC Labs* makes] the W. D. Wash [] somehow already familiar with the facts
of *this case* is far-fetched, at best."  (Mem. Opp. Mot. Transfer 17, ECF No. 47 (emphasis in
original).)  ThroughPuter also argues that "the effort expended by the W.D. Wash. in *SRC Labs*"
is overstated because the litigation has been stayed since November 2018.  (Mem. Opp. Mot.
Transfer 17, ECF No. 47.)  The Court notices that the stay was lifted on January 31, 2022.  (*See
FG SRC, LLC v. Microsoft Corporation*, No. 2:18-cv-00321 (W.D. Wash.), Dkt. No. 174.)

Nevertheless, judicial economy and the avoidance of inconsistent judgments favors—
even slightly—the Western District of Washington, which has "already committed judicial
resources to the contested issues" here and is currently litigating a "case involving similar issues
and facts." *Samsung*, 386 F. Supp. 2d at 722.  Therefore, the factor of systemic integrity weighs
in favor of granting Microsoft's Motion to Transfer.

### b.    Fairness Weighs in Favor of Transfer

Fairness weighs in favor of transfer to the Western District of Washington.  "Fairness is
assessed by considering docket congestion, interest in having local controversies decided at

---

[16] This Court granted Microsoft's Motion to Transfer the case from the Eastern District of
Virginia to the Western District of Washington. *See SRC Labs, LLC v. Microsoft Corp.*, No
1:17cv1172, 2018 WL 10425506 (E.D. Va. Feb. 26, 2018).

home, knowledge of applicable law, unfairness in burdening forum citizens with jury duty, and interest in avoiding unnecessary conflicts of law." *Byerson*, 467 F. Supp. 2d at 635.

"[D]ocket conditions, although relevant, are a minor consideration." *Koh*, 250 F. Supp. 2d at 639.  ThroughPuter emphasizes that "2020 statistics reflect that the Eastern District of Virginia, on average, provides a speedier path to trial (11.6 months) than the Western District of Washington (19.1 months)." (Mem. Opp. Mot. Transfer 16–17, ECF No. 47.)  Microsoft notes that "[f]or the 12-month time period ending May 21, 2021, the Eastern District of Virginia had 3,578 pending cases, an increase of 2.6% over the previous year. . . . In contrast, for the same period, the Western District of Washington had slightly more pending cases (3,653), but a smaller increase in pending cases (0.4%) over the previous year." (Mem. Supp. Mot. Transfer 14, ECF No. 39.)  On balance, then, the docket conditions in the Eastern District of Virginia and Western District of Washington appear similar.

The interest in having local controversies decided at home, however, weighs strongly in favor of transfer.  This case concerns technology developed in the Western District of Washington that allegedly infringes patents that were almost all acquired while ThroughPuter and Mark Sandstrom were residents of New Jersey.  Despite ThroughPuter's intent to do so, it does not yet compete against Microsoft Azure in the marketplace in the Eastern District of Virginia.  The allegedly infringing technology was developed in the Western District of Washington and all allegedly "willful" actions took place in the Western District of Washington. Therefore, the heart of this controversy exists in the Western District of Washington.  "Courts are traditionally willing to transfer cases to the districts in which the events giving rise to the suits occurred." *Finkel*, 2006 WL 2786811, at *5.  Because the alleged conduct giving rise to

28

this action occurred in the Western District of Washington, this factor weighs strongly in favor of transfer.

Microsoft avers that the remaining fairness considerations are neutral or weigh in favor of transfer. (Mem. Supp. Mot. Transfer 14, ECF No. 39.)  Because this action arises under federal law, "this Court cannot be presumed to have greater knowledge of the applicable law than does the federal court in [Washington]." *Byerson*, 467 F. Supp. 2d at 635.  Therefore, knowledge of applicable law is similar, and conflicts of law issues are unlikely to arise [because] ThroughPuter has not previously litigated the asserted patents here or in any other district." (Mem. Supp. Mot. Transfer 14, ECF No. 39.)  Therefore, these factors weigh neutrally.

Thus, both systemic integrity and fairness weigh in favor of transfer, so the interest of justice weighs in favor of transfer.  Because the convenience to the parties and witnesses also weigh in favor of transfer and ThroughPuter's choice of forum is not entitled to substantial weight in this case, the Court finds transfer to the Western District of Washington appropriate.

### IV.  Conclusion

For the foregoing reasons and "[f]or the convenience of parties and witnesses, in the interest of justice," the Court will grant Microsoft's Motion to Transfer and transfer this case to the Western District of Washington.  28 U.S.C. § 1404(a).

An appropriate Order shall issue.


Date: 3-23-22
Richmond, Virginia

_____ /s/
M. Hannah Lauck
United States District Judge